We will hear argument first this morning in Case 19-547, United States Fish and Wildlife Service v. Sierra Club. Mr. Garnieri. Mr. Chief Justice, and may it please the Court, the December 2013 draft biological opinions are privileged, free-decisional, deliberative materials. They were written by staff at the services as a recommendation to agency decision-makers about the position the services should adopt in the ongoing consultation with the EPA. When the relevant decision-makers were presented with these drafts, they did not adopt them. They did not sign them, and they did not even transmit them in full to the EPA. Instead, they decided that more work needed to be done before making a final decision. The Ninth Circuit committed two principal errors in concluding, nonetheless, that these drafts are outside the scope of the deliberative process privilege. First, the Ninth Circuit treated the draft as final rather than pre-decisional because it viewed them as the services' last words on the version of the EPA rule under consideration in December 2013. But the EPA modified its approach, and the services never had any occasion to make a final decision about the abandoned version of the EPA rule. In the D.C. Circuit's memorable words, the December 2013 draft opinions died on the vine without ever blossoming into a final decision. Second, the Ninth Circuit viewed these drafts as final documents because the drafts largely don't contain redlining, marginal comments, or other obvious signs of still being in flux. That reasoning is unfound. No one would confuse a law clerk's draft with a final decision by a judge, even if the draft is pristine. The key point is that the decision-makers at the services had not yet made up their minds. Their deliberations had not yet come to an end. When the services did make a final decision in May 2014, they released an 85-page joint opinion explaining their reasoning to the public. Here, respondents seek to compel the disclosure of earlier drafts, which recommended reasoning that the services never adopted about a version of the EPA rule that never saw the light of day. The court should reject respondents' efforts to pry into those materials. Mr. Garnieri, before you can decide whether something is pre-decisional, you have to know what the decision is. Why isn't the decision here EPA's final rule on the cooling water intake structures, and the services' opinion simply is pre-decisional from the perspective of that final rule? Mr. Chief Justice, we think the final decision here is the services' decision in the ongoing consultation. So, that is, the final decision occurred in May of 2014 when the services exercised their authority under the Endangered Species Act to render a biological opinion with respect to whether EPA's proposed action would cause jeopardy to endangered species. But that doesn't do, I mean, that itself doesn't represent any action by the service with respect to anything other than the EPA decision. I mean, it is pre-decisional with respect to that decision. That's right, Your Honor, but we think the deliberative process that should be the focus of the court's attention here is the deliberations that were occurring within the services about whether or not EPA's proposed action would cause jeopardy. No, I know that's what you think. I'm trying to figure out why. I mean, you talk about, within an agency, the different steps in the process, and you say, well, none of those steps is actually, you know, final and decisional. But here, all of a sudden, you get to the end of the services' role, and it's final and not pre-decisional, even though it's just part of another ongoing process. In other words, I'm not sure that your position doesn't prove too much. Mr. Chief Justice, we think the statute itself makes clear that there is a decision-making process that concludes with the issuance of the final biological opinion. That's in Section 7B2 of the Endangered Species Act. The implementing regulations also make clear that with respect to the interagency consultation, it concludes with—that process concludes with the issuance of a final opinion. Now, of course, if the court were to view the deliberations here more broadly, as encompassing also the EPA's rulemaking, then it's clear that the EPA didn't make a final decision and didn't issue a final rule in that rulemaking until May 2014, so the drafts that are issued here would also be pre-decisional with respect to the EPA's final rule. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, I'd like to follow up with the Chief Justice's line. What if there were not a regulation that prohibited the issuance of a final opinion before or while the draft was under review by the requesting agency? Well, you know, certainly we think it's helpful here that the regulations clearly contemplate that there would be a sharing of drafts in some circumstances between the services and the action agency, and here the services didn't actually even reach the point of sharing the draft opinion in December 2013. The drafts were never transmitted in full to the EPA at that point, but counterfactually, if there were no regulation, then still, at least on the facts here, it's clear that the services had never made a final decision in the consultation in December 2013. The declarations that have been submitted by agency officials make clear that the relevant decision-makers did not adopt these drafts when the drafts were presented to them in December 2013, so we really think that's dispositive here of the fact that the deliberations were ongoing at that point in time. So, what if you were right? I'm trying to figure out, like, if you're right up to the line that there is no more deliberation, that, let's say, it's a final, final draft, and you simply are calling EPA to give a heads-up that you're about to send it in five minutes, would you make the same argument? Anything short of actually sending it, that's what I'm getting at. Yes, Justice Thomas. Now, of course, we're quite far from that point in this particular case, but I think in general, the principle that we are advocating here is that until there is actually a final decision, the agency decision-makers are free to change their mind in the consultation, and so that is really the critical distinction between sort of having a near-final draft that is on the verge of being transmitted and actually having a final agency decision that represents the service's final opinion in the consultation, and until reaching that point, the deliberations are still ongoing, and the services, the decision-makers at the services could change their mind about any aspect of the agency's analysis. So, anything short of just pressing the send button is non-final? Well, it's not... To be clear, it's not the transmittal, it's not hitting the send button to send it to the EPA that we think is the critical distinction. It's the point in time at which the agency decision-makers actually exercise their authority to issue a biological opinion in the consultation, and they were far short of that here in the December of 2013. Thank you. Justice Breyer? Well, I'm not... One, I'd like any comment you have about the test. I mean, the object is, will this document, in fact, diminish agency decision-making quality by discouraging the staff and others from debating if it's going to become public? And you might have a better choice or not. I'm curious. But the words that have been used are pre-decisional and deliberative. Hmm. Maybe. Okay. So, that's one in the back of my mind, anything you want to say. And the other thing, at least in some of these documents, and we'll have to look through the record, it seems to have reached a final stage. I mean, people say, when you make these final changes, which they made to the draft, I can email the assistant director, and we have an autopan with his signature. We can use to send it out, and I'll send it to the EPA. And, in fact, that's what they normally do. I mean, normally what they do is they send these things over before they're absolutely final. The EPA makes changes, and then it never appears. That happened apparently thousands of times, and only twice did they actually publish it. So, you get what I'm driving at, and if so, I'd appreciate your thoughts. Sure. Well, with respect to your second set of questions, Justice Breyer, the emails that you're referring to are emails about finalizing the draft for transmittal to the EPA. So, it's abundantly clear in those emails, even in the email suggesting that the transmittal letter could be signed by autopan, it's very clear that the services understood themselves to still be working on draft biological opinions, and they had committed previously to sharing a draft with the EPA. So, even if they had transmitted that draft or transmitted those documents, they understood themselves to be transmitting a draft that did not yet represent a final decision. With respect to Your Honor's first question, the lower courts have understood this court's precedent on the deliberative process privilege to require that a document be both pre-decisional and deliberative in order to qualify for the privileges. We're not taking issue with that. We think if the court were to apply that framework here, these documents would certainly satisfy it. Okay. Thank you. Justice Breyer, if I may also, your question alluded to the fact that there are relatively few jeopardy opinions. That's certainly true. There's an empirical study cited in the AMCUS brief suggesting that jeopardy opinions are relatively rare, but we don't really see any particular problem with that, and I think that could be simply a sign that the consultation process required by the Endangered Species Act is working as intended. Federal agencies are incorporating these standards into proposed agency actions and are reliable, avoiding actions that would cause jeopardy. Justice Alito, are there examples of situations in which a jeopardy biological opinion has been issued, but the action agency has then gone ahead with the action in the face of that? Justice Alito, I'm not aware of such an example. There are a handful of examples. To step back for a second, the Endangered Species Act, as the court discussed in Bennett against Spears, the Endangered Species Act at least theoretically permits an action agency to decide that, notwithstanding the biological opinion, the action agency has decided that its action would not cause jeopardy. I don't know that that's ever occurred. There are a handful of examples. The statute also permits an action agency to obtain an exemption from a cabinet-level committee, and that has occurred on a handful of occasions. Well, if it almost never occurs, then something that is labeled a draft biological opinion may really be tantamount to the service's final word on the subject unless it can be persuaded by the action agency to change its opinion or the action agency makes an adjustment in what it was previously proposing to do. Isn't that the case? I think the draft aspect of the opinion, I mean, from our perspective, the key point here is that the agency decision-makers at the services had not yet actually made up their minds about whether the version of the rule that was under consideration in December of 2013 would cause jeopardy. Okay, well, maybe that's true, but I'm interested in where your argument goes, where we should draw the line. Do you want us to draw a line between those draft biological opinions that do not reflect, that reflect all of the deliberation that the service intends to conduct internally, or does your argument logically lead to the conclusion that no draft biological opinion can ever be final? I think it's the latter, Justice Alito. No draft biological opinion, by definition, if it is a draft opinion, then it is pre-decisional and deliberative because the agency has not yet made up its mind. The services have not yet made up their mind in the ongoing consultation, and there are good reasons for that. One of them is that, you know, as the regulations contemplate, the services will often share these draft opinions with the action agency, and that process of sort of the give and take between the services and the agency that is consulting the services can be helpful to refine the draft opinion and for the services to better understand the proposed agency. Thank you, counsel. My time has expired. Justice Sotomayor? I am following up a little bit on Justice Alito's questioning. In Senate, we held that biological opinions, while technically advisory, have, quote, a powerful coercive effect on the action of the agency. Why is it that a draft Jeopardy opinion doesn't have the same coercive effect? As I think the Ninth Circuit pointed out, what was at issue was the November rule that the EPA was proposing, and the draft that was sent to the EPA made them change their minds. They did something completely different. With respect to the decision relating to that November action, the draft opinion did exactly what a final opinion is intended to do. So I understand your basic argument, that it wasn't clear the agency final decision maker had accepted that that was the Jeopardy opinion they were going to get. But I go back to Justice Thomas' question. If that agency head was about to sign it and said, I'm just going to send it to them and tell them I'll sign it on Monday, I don't want to go into the office on Sunday, it would be your argument that that wouldn't be a final opinion worthy of disclosure. Justice Sotomayor, to take those questions in sequence, I think it's abundantly clear that in Bennett v. Speer, the court was discussing final biological opinions, as evidenced by the court's focus on the legal force and effect of the incidental take statement that is issued when the agency, when the services render a Jeopardy, excuse me, a no Jeopardy opinion. So the court's focus there was on the fact that the final biological opinion does have real force and effect. It has legal consequences. None of those consequences attach to a draft biological opinion. The statute and the regulation attach no legal consequences whatsoever to a draft biological opinion of the kind that are at issue here. Counsel, I have one question I want to get to. In the Ninth Circuit, you agreed that a remand would be appropriate to determine whether the documents contained segregable factual information. Do you think that if we were to rule in your favor, we would still have to remand for that to happen? Yes, Your Honor, that would be appropriate. Under Section 552B, if a document qualifies for one of the exemptions set forth in Subsection B, then and only then would an agency determine whether, notwithstanding the fact that the document qualifies for an exception, there are portions of it that could be segregated and released. So that did occur after the Ninth Circuit decision. That did occur with respect to three documents that the Court of Appeals found to qualify for Exemption 5. If this Court were to sustain our assertion of Exemption 5 here, then the same kind of analysis would follow on remand. Thank you, Counsel. Justice Kagan? Mr. Guarnieri, could I focus on the part of your argument, which is that the relevant decision-makers were still working on the draft, and give you a hypothetical, which is that the draft came to the relevant decision-makers, and he looked at it, and he realized that it was going to cause a big problem for the EPA. And so he said, you know, I'm not going to send this over. I'm going to give the EPA head a call and just tell him everything in it. And that will ensure that there's nothing foiable in this document. What would your answer to that be? You know, he has the document. He's not working on it. But he doesn't want to make it foiable. And can he un-run this in that way? Justice Kagan, there is a body of existing law in the lower courts addressing circumstances in which an agency has implicitly made a final decision. Some of those principles might be brought to bear on the hypothetical that Your Honor is proposing. But here, there's really nothing in the record to suggest that the agencies had implicitly made a final decision, even if they had not memorialized that by, for example, assigning and publicly issuing a biological opinion. And, in fact, here, the evidence is really all to the contrary. There are declarations from agency officials, including for the Fish and Wildlife Service, there's a declaration from Assistant Director Frazier, who was himself the agency decision maker for Fish and Wildlife. And he says that he was presented with these draft declarations and he determined not to make a decision at that time because he felt that more work was needed in the consultation. Yeah, it's a very general statement. Do you have any sense of what more work needed to be done? Because one way to understand what happened here is that everybody really responded and acted as if there were a completed draft opinion. You know, there was sending the reasonable alternatives over. The EPA starts talking to the service about how to change its rule. The EPA does change its rule. It was as if, you know, everything that happened was as if there had been a final draft opinion that was sent to the EPA. Justice Kagan, among other things, Assistant Director Frazier said that, and this is at page 58 of the joint appendix, that key elements of the EPA's rule were still being deliberated within the EPA. So I think the declaration reflects that there was a significant degree of fluidity here, both as to what the services plan to say in the consultation and also what the EPA's final rule would look like. Now, it's difficult to describe exactly the conversations that occurred from December onwards without revealing the substance of the agency's privileged discussions, but the declaration, I do think, makes clear that, you know, there were a number of moving parts here. It wasn't simply EPA revising its rule in response to the draft biological opinion. Thank you. Justice Gorsuch. Good morning, counsel. Let's say EPA had decided at the end of it to just withdraw its rule and give up, at least for the time being, maybe come back to it in five or ten years. Would that be a final decision? And if so, would that have made the last draft that the service gave the EPA discoverable or not in your view? Justice Gorsuch, as I was trying to articulate earlier, we think that the key question here is whether the services had made a final decision. And so if the services rendered a final biological opinion, finding jeopardy in the consultation, and that caused the EPA not to proceed with its proposed action, then certainly there the service's final opinion would, in effect, not be privileged and actually as a matter of agency practice. I got that, counsel. So would the EPA decision itself not to proceed? It died on the vine. But would that be nonetheless final and itself discoverable? Would the EPA's decision be final and discoverable? That's the question now. I suppose it would depend. I mean, if the EPA memorializes its decision not to proceed in the rulemaking in some sort of agency document, then this explanation of why it had chosen not to proceed would not, hypothetically, would not be pre-decisional or deliberative and therefore would be deployable. But it's just decided in its last draft, you know, we're not, we just, it's too hard. We can't do it. We'll give up internally, but it doesn't, it doesn't publish anything. Would that be final? No, I don't think that would be final. And in fact, that would be reminiscent of the situation that this court contemplated in footnote 18 of its decision in Sears, which is that, you know, you're, you're going to have privileged internal deliberations that do not result in any final decision because, you know, you could have a degree of kind of agency brainstorming that doesn't ultimately lead to any final agency action. And in that circumstance, the agency's deliberations are privileged even though they do not culminate in any specific final decision. And what if, what if, what if alternatively the leadership of the service had, you know, signed that last draft and send it over to EPA? EPA didn't, whatever happened at EPA happened, but the services signed something. The EPA though, you know, ultimately maybe decided not to do anything. Would the service document be discoverable? If the services document remained in draft form and had never actually been issued as a final. No, it was, I'm supposing now it was signed by the leadership of the service and sent over to EPA. But EPA decided to do nothing. Its regulation died on the vine. I see. I see. Yeah. That would be the, when the agencies reach a final decision in a consultation, they release their opinion, their biological opinion to the public. They sent it over to EPA because EPA was still in draft form, but the service decided they'd come to a final view on the draft of EPA and they signed it. Then that, then, then that, that would be a decision that would, we could not withhold under the deliberative process privilege because the services has reached a final decision. They have exercised their authority under the endangered species act. And thank you. My, my, my time is over. Thank you. Justice Kavanaugh. Thank you, chief justice. And good morning, Mr. Guarnieri. Just to follow up on the chief's questions and justice Gorsuch's questions. It's possible. I think in your view that even a final agency or opinion or memo could still be pre-decisional as part of a broader deliberative process. And a draft opinion, which we have in this case in your view is even more obviously pre-decisional. Is that correct? In terms of a general statement. I do think that's correct. And that's why in our briefing, we refer to these in places as drafts of drafts because here the EPA, I mean, the December 2013 draft biological opinions and not even reach the point of being transmitted as drafts to the EPA. To follow up on something that justice Kagan asked, does the motive of the agency official with respect to FOIA play a role in determining how a court should assess whether it's obtainable under FOIA? It is not traditionally been a part of the analysis that this court has engaged in for the deliberative process privilege. As I said to justice Kagan, I think there are existing doctrines that can address any concerns along those lines, including doctrines under which an agency may be determined to have implicitly reached a final decision, even though a document might be notionally labeled a recommendation or a draft. But those are simply inapplicable here. There's really no basis for that. The services that the decision makers at the services had made a final decision in December, 2013. I think there's a concern lurking in this case that executive branch officials might just stamp draft on everything and therefore evade FOIA. Can you respond to that concern? Sure. I take the point justice Kagan, but we're just very, very far from that here. Here we are in the molten core of the deliberative process privilege where it's clear from the record that the agencies, the decision makers at the services didn't adopt the draft opinions when they were. If I could interrupt, I understand that point as to this case, but how we frame the rule or the principle will matter. And how exactly would you have us frame the principle of law that governs here? Well, we expect that the lower court formulation that a document must be both indecisional and deliberative is, is that sort of accurately captures the substance of this court's case law with respect specifically to whether or not a document is labeled draft. We do think that it's important. I mean, it has a significant meaning within the executive branch when a document is labeled draft. It's a signal to other parties that the document has not yet been finalized, but you know, of course, to address the concerns that your honor has mentioned, the labeling of a document as draft wouldn't necessarily be just positive. It would be an important factor, but of course, it also looks to other factors to ascertain whether a document was still in fact in draft format. Okay. Thank you. Justice Barrett. I want to pick up on the thread that justice Kavanaugh was just exploring with you. You said that if a government official simply stamped draft on it and sent it over and as justice Kavanaugh is positing did so in order to avoid FOIA disclosure requirements, you said that a court might look at other factors to determine whether it's still final. What other factors would a court consider? I think a court might look to the treatment of the document within the agency's process. And there are circumstances in which the lower courts have found that the labeling of a document as draft might be considered pretextual, if you will, in light of other evidence about the processes that generated the document or the consequences that were attached to the document within the agency's administrative process. But, you know, here are those factors tip decisively in our favor. We have the declarations making clear that the agency decision makers didn't reach a final decision. We know that they didn't publicly issue the December, 2013 draft, even though a final biological opinion is publicly issued. And we know that they had committed in advance to share a draft with the EPA and they didn't even reach that point because they determined that more work needed to be done with these, with the draft opinions that were presented to them in December, 2013. So those are all kinds of referral considerations that a court might take into account in determining that the label of the document as draft is in fact accurate. That's a pretty fact intensive determination then. So it's not your position that we should adopt some sort of bright line saying, listen, it's not over until it's over. It's not until it's actually issued in the sense of being final, maybe even in the benefit versus fear sense of the word, you're not asking for a rule that's that bright. Well, we think that those considerations for this particular scheme, the line is very easy to draw because it's so clear that the Endangered Animal Regulations set up a process in which the deliberations conclude with the issuance of a final biological opinion. And I think the court could dispose of this case on that ground alone. But if there are concerns that, you know, disposing of the case on those grounds might lead to evasions or protectual use of the label draft in the future, I was just trying to give the court some comfort that there are other considerations that could also be brought to bear to make sure that that isn't occurring. Your first order of preference would be the kind of formalistic line that I was just describing. And then your backup argument would be if the court was uncomfortable about the possibility of avoiding FOIA obligations by say the stamping draft on the top, that we go with the more kind of multi-factor fact specific test, you know, maybe to see what the agency holding this out as a final opinion. Yes, Your Honor. Yes. I think that that captures the way that we think the case ought to be handled. The deliberative process privilege here ought to extend to all of the deliberations that proceed the issuance of the actual final biological opinion. Thank you. Mr. Garnieri, do you want to take a minute to wrap up? Thank you, Mr. Chief Justice. I would just emphasize again, as I've tried to several times this morning, that there can be no real dispute on the facts of this case, but the decision makers at the services did not make a final decision in December, 2013. But the record is clear that they did not make a final decision in the ongoing consultation until May of 2014. And when they made that final decision, they released an 85 page joint opinion with several hundred pages of appendices explaining to the public the reasoning that led them to issue a no jeopardy opinion in this particular consultation. Until that point in time, the agency decision makers were free to change their minds and the deliberative process within the agency had not yet come to an end. Thank you. Thank you, counsel. Mr. Nalrayan. Thank you, Mr. Chief Justice. And may it please the court. I'd like to begin with a standard that follows from Sears and which should resolve this case. The document explains the decision made by the agency with appreciable legal consequences. Exemption five does not apply. The opinions here explain a decision made by the services. The EPA's proposed regulation jeopardized protective species. It's fair to hold that jeopardy decision has legal consequences. Because the services conclusions invariably get deferred. The services jeopardy determination made it very likely that EPA's proposed regulation would be overturned unless EPA adopted additional protection. None of that turns on whether the services label their opinions draft or final. Indeed, as the amicus brief explained, the services almost never exercised their jeopardy authority to final jeopardy opinion. The jeopardy decision reached earlier in the process achieved the same legal consequence. It forecloses the agency's proposed action and requires adoption of a more protective alternative. The lower courts have expressed concern as to the workability of the standard and so far as it allows courts to look past labels like draft or non-binding. But the lower courts have been doing just that for 40 years with no unusual difficulty. Those cases like this one follow the standard quiet practice. The result on summary judgment based on the governing statutes and regulations together with the agency's record and declarations and a necessary examination of the documents themselves. The Endangered Species Act may call the services review a consultation. But in reality, the statute gives the services decisive case-keeping authority over other agency's actions. The stake here is whether the public has access to the reasons underlying the services exercise of that statutory authority. Council, government decision-making often involves several different layers. You know, the issues addressed by the section and then it's turned over to the Bureau, then it goes to the division, and eventually say to the final decision maker. What if that decision maker looking at all this says, you know, I think the Bureau got it right. I don't think the division did much at all. I liked what they did. Does that mean, in other words, and that's why I'm making the decision I am because I think the Bureau analysis was right. Does that mean that the Bureau analysis is disclosable because it is the one that had operative effect? If the decision maker on behalf of the agency adopts that Bureau's view as a basis of the agency's decision, then yes, I think that is the basis of a decision that is actually adopted. Well, but that's certainly pre-decisional. I mean, it goes up to the division and then only then to the agency director. I mean, the agency did not adopt the final recommendation from the division, but rather something that certainly was pre-decisional. We're talking about the decision that the director chooses as the basis of the agency's decision. Yeah, and it's in this chain of responsibility that leads up to him. He picks one in the middle. He says that's what is going to affect, that's what I'm going with. Is that, even though it's pre-decisional in the sense that there were several other layers before it got to him? I think it is under Sears because Sears says that if an agency chooses to adopt a document that was pre-decisional but makes it the basis of its actual decision, then that doesn't raise concerns for two reasons. One is that that's the decision of the agency and the criticism is going to go to the agency. It's decision. And the second is that, in general, again, this is Sears, not me, but when that happens, the lower decision-maker is not embarrassed. They generally tend to like the fact that the agency has taken their decision and the decision-maker has chosen it as his or her own decision. Counsel, the operative effects test seems sort of tailor-made for the facts here, but it doesn't seem to be very helpful in most cases. In most cases, you can't pick a particular item in the decisional process and say this is the one that drove the decision. So how would your test work in the typical case? If there is no statement of basis that's there at all, the FOIA doesn't require an agency to write one up. So, you know, one feature here is that the regulations do require the services to have a statement of basis, that is, their opinion, their jeopardy opinion, available if the action agency asks for it. Thank you, Counsel. Justice Thomas? Yes, I'd like to pick up a bit on the Chief's line of questioning. How far back would you go in the process? We asked the government how close to the line of actually sending the proposal out or the rule out, can he come to before it ceases being a draft. I'd like to ask you how far back in the process can we go before it is not discoverable? And it's a part of the deliberative process as opposed to something that is subject to FOIA. Well, I mean, in this case, I think the important thing is that by all indications, the record, this analysis, that is, it's a conclusion. I don't think it goes much further past that. That is, if the analysis is not complete and they haven't, and they're still working on it, then that is legitimately deliberative and pre-decisional and is not disclosed. So how do you determine that? I think the government says as long as they still, they have not said it's final, it's still a part of the deliberative process. Why don't we take them at their word? Well, I mean, I think the reason not to take them at their word is that that then hands control of disclosure to the government based on how they choose to characterize documents. In this case, I really do think it is the record as a whole. And there are four elements in particular that I think deserve attention, keeping in mind that the burden is on the services here. The first is that we know the services had a decision to make. The EPA gave them their regulation so they could decide. That is passed under the Endangered Species Act. And the second is that when the time came to make that decision, under the schedule that the agencies agreed to with Joint Dependency 91, the services conveyed the conclusion that the regulation caused jeopardy and that the next steps were reasonable and prudent alternatives. And we know that there were no further deliberations, either contemplated or that occurred, as to the viability of the proposed regulations. And in EPA's final rule, it said, these changes were the result of the services' consultation in order to avoid jeopardy. And all of that, with no support for the services' claim that their analysis was somehow not yet done or incomplete or inconclusive. So what's at stake here? EPA's first rule, it doesn't,  They've got a different rule. So what's at stake? Why do you need, what information are you trying to get about a rule that's no longer in place? Well, in this rule, what they've said is that they are going to make permit-by-permit determinations as to what is required to avoid jeopardy and protect species. And what, if you're interested, is knowing that those future decisions are consistent with the basis by which they have made these changes. So that if, for example, it's turtles at a certain kind of plant, that future permits protect turtles at those plants. And industry had a different set of concerns, which is simply knowing that when the agency exercises authority, they're doing it on sound grounds. Thank you. Justice Breyer? Well, this is complicated, because I think there's several documents here. So I'm going to ask you just to check me, and don't say I'm right if I'm not right, okay? Okay. First, we are talking about the animal, the Fish and Wildlife Department and the marine fisheries, okay? What they're supposed to do is they write a document called a biological opinion. Is that right? Yes. Okay. In the history of this Act, that document, once they publish it, will force EPA to change it, basically. And that document has been actually issued never. I mean, let me not exaggerate. In 7,000 cases in seven years, they issued one exactly twice. Now, the reason is, there is a different document called a draft biological opinion. And what happens when they write that draft is they send it to EPA, and they negotiate, and EPA eventually ends up probably doing what they finally agree to do. So we're talking about that draft biological opinion. And it has two things about it. One, we're going to negotiate this with EPA, and two, private people who have nothing to do with the EPA can get a hold under FOIA of that document. Is that right? Yes, it should. I think that what is being negotiated is not a jeopardy conclusion, but what happens next, that is. There is a document called draft biological thing, and things happen as a result of that, and it's pretty clear that private people can get a hold of it. Indeed, there's a reg to that effect. Is that right? That's right, if there's an applicant involved with the process. An applicant can get a hold of it. So I thought that that was, once you write that draft biological opinion, you've got something that's final enough that somebody can get it under FOIA. Now the question here is, well, what about the draft leading up to that draft? And that's what we're trying to get, or not get. Is that right? No, Your Honor, I think our position is that this document is that draft. I mean, EPA didn't ask for it. But it doesn't say it, and so the government says, well, this is just a draft of the draft, or maybe the government means, no, you can't get a hold of the draft, in which case you can never get a hold of anything because they never use anything beyond the draft. Is that right? That's how I understand the government's position, but to be clear, all they said is that EPA didn't ask for it, so it was never formally transmitted. It is an overportion, and this does appear to be the statement of basis for the Jeopardy conclusion. So your view is, I look through the nine, or the documents that are supposed to be turned over or not, I read this record, and I ask myself, is this in effect the draft biological opinion or is this a document that is part of the debate within the agency that will lead up to the draft biological opinion that will serve as a basis for discussion with EPA? Have I got that right? Yes, along with the rest of the record. Okay, okay. Now I know what to do. That's extremely helpful. Thank you. Justice Alito, well, I really don't know what to do. We face a conundrum. One is for us to say that if it's a draft, it's privileged. The other is to try to draw a distinction between different kinds of drafts. So let me ask you this. Suppose that the services went through a three-step process in issuing a biological opinion, and the draft produced at step one turns out to be what the service will ultimately issue 90% of the time. What emerges from step two is what it will issue 97% of the time. And what emerges from step three is the final product. Now at what point do you think a document would become non-privileged? So I think the answer is going to depend on the particular process, the decision-making process that actually occurs, because they've given themselves a lot of flexibility. In a case like this one where there was no further deliberation that seems to have been contemplated or that occurred, then it is a 90% draft because the 10% simply doesn't seem to be an issue in this case. EPA chose not to interrogate their determination here as they would normally do. Well, with respect, counsel, I don't know how satisfactory that answer is, because if a service is determined not to have this released under FOIA, all they need to do at every step is simply to say, this is what we think up to this point, but of course, this isn't our final word. We're open to hearing other information about this but it's made explicitly non-final, subject to further internal deliberations until it's finally issued. Well, no, I mean, the fact that they could change their mind in their own discretion is clearly not enough. I mean, Sears said that at footnote 25. Froman did not stand for that proposition. So, if all they say is, well, in our discretion, we have some room to move, you don't even have to have a final biological opinion. If you have a situation in which they have a process set up where they say, look, we're giving you a draft and we want your opinion and we intend to respond to it, if a real deliberative process is set up within the rulemaking, then that's a different kind of draft. Well, to help me, could you just say as succinctly and precisely as possible what you think the test is we should apply in distinguishing among opinions that are labeled drafts? If the draft opinion reflects a decision made by the agency with appreciable legal consequences, then it needs to be released. Well, I mean, if it was, if step one was followed 50% of the time, that would have appreciable legal consequences, wouldn't it? I think it would. I just want to be clear that, you know, 50%, I mean, if it is a discretionary reconsideration process and the services have all the power to control what happens in that other 50%, then yes. Thank you. Justice Sotomayor? Counsel, I'm, I guess I'm getting bogged down in the details, but I do want to do a little bit. In this case, what is clear is that all we know is that portions of the draft Jeopardy opinion went to the EPA. And I know that, or at least my law clerk has looked through the record and not been able to find an answer as to what portions. But how can we say that there was a final draft Jeopardy opinion that was signed off if the EPA never saw it? And if they never saw it and were working in a collaborative process thereafter, to change their rules, how could, how can it help you to look at that draft when the EPA, in following whatever it's doing now, was never informed by the draft? So, in answer to I think the first part of your question, if you look at 40214G5, what it says is that when the services reach this stage of the process, they need to make a Jeopardy conclusion as to the regulation they've been given. They need to have essentially a statement of basis available to the action agency if the action agency wants to submit comments. And here EPA, again, chose not to submit comments. It didn't want to interrogate the service's opinion apparently. But that is still a statement of basis that provided, that explains the service's decision and the EPA didn't ask for the thing to be formally transmitted. And it doesn't really affect that document's purpose or the upward effect of the decision itself. As to why we want to see it even if EPA hasn't, the problem is that these Jeopardy decisions don't just affect the action agency. Ultimately, they affect the public and the regulated community and everybody else. So for our purposes, the service is going down the line and they exercise their supervisory authority to behave in a way that is consistent with the conclusion they reached here remains important. Could you articulate for me your rule again? We know there has to be some collaborative process. There has to be some collaborative process within the services and then with the EPA. At what point is the draft biological opinion articulate the rule that you want us to write finally in your judgment or subject to disclosure? When the draft opinion provides the basis for a decision made by the services that is the agency as a whole that has appreciable legal consequences, then that opinion needs to be disclosed. Thank you, counsel. Justice Kagan? Mr. Narayan, I assume I agree with you for the moment that what we might call a final draft opinion is voyable. The one that triggers the back and forth between the service and the agency. But the government here says this was not such a final draft opinion. It characterizes it as a draft of a draft and it points to the various decision makers' declarations. So what evidence do you have that the government is wrong to say that? Well, I think the measure of those sorts of conclusory statements like this was deliberative is the fact that the government has offered to support their conclusion. Well, it's not just conclusory statements. I mean, you have the service head saying I thought that more work needed to be done on it. I was not ready to sign off on this. That's correct. But the only work that they've described is coming up with an alternative that they would approve. So yes, more work needs to be done. But then in this particular process there appears to have been no work either contemplated or that occurred as to the permissibility of the proposed regulation. And the only reason they give for changing their jeopardy conclusion is that EPA agreed to add these additional measures which again EPA itself ascribed to the service's determination through the consultation. So, again, I think it's fair to say that more work needs to be done. But if the only work that needs to be done is to essentially follow through on the consequences of the jeopardy determination then I think that's not enough. Well, suppose that the service head got a memo from a staffer saying this is a bad idea. There's going to be all kinds of jeopardy. And the service head really did not look at it very closely. You know, hadn't decided whether he was ready to sign off on it. But he did realize that there were some issues here and he calls up the EPA and he says, look, I haven't gotten all the way through this. I haven't made a final decision yet. But I think that there might be a problem here and I want to get you to talk to my guys and to try to work this out informally. Would you say that there's a foyable document there? No, I wouldn't. I mean, our point here is that the services haven't made that showing in this record. And the other point is that they are required to have a statement of basis available under R02-14-G5 when they reach this stage. That is when they make a jeopardy conclusion. Well, I guess why isn't my hypothetical essentially this case if we treat declarations as serious and as worthy of, you know, being, you know, we should respect them unless we see something to the contrary. Basically, the head of the service looked at this and said, I don't know if I'm ready to sign off on this. I think maybe more work would need to be done to put this on final form. I think that there's probably an issue here. I want to get everybody to start talking about it. I mean, I don't know if I'm ready to go to EPA if EPA asked for it. All that happened is that EPA didn't ask for it. Thank you. Justice Gorsuch? Good morning, counsel. I think we all understand the problem of the government effectively stamping everything draft and the concerns that attach to that. I just wanted to explore the concerns on the other side of the issue. I think when you back down privately, the government sometimes winds up making worse decisions rather than better ones. Here, it does seem like because of the back and forth privately, EPA came up with a rule that might be better from your perspective. How do we balance that concern and allow agency sufficient room to maneuver privately to avoid having to embarrass themselves later and allow them to save face to get to better policy results? If the agency puts those facts into the record, I think fair enough. The key point is if the agency is going to back down, it has to back down from its decision. You can't make the decision and say, well, we're not going to ignore it. I think you would agree that EPA got to a better result thanks to the services and formal interventions, right? Yes, we agree. There has to be some room for that kind of private negotiation, don't you think? Yes. To be clear, we're not complaining about the services making EPA more protective. The services really do have the authority. I'm asking, are you at all concerned that a more productive back and forth discretion? How do we balance that concern? No, your honor. We're not concerned for a couple of reasons. One is that the biological opinion is mostly scientific studies and facts. So it's not the sort of thing that lends itself to the embarrassment. Those things are normally subject to peer review. And then in this sort of back and forth, what's important is you have one party who has authority and one who is acting like a supportant. In that circumstance, yes, there is some balancing, but it's important to  that we effectively foreclose a proposed regulation. From EPA's purposes, we've reached the end of the line for us. All I need from you is probably good. Justice Kavanaugh? Thank you, Mr. Chief Justice. Good morning, Mr. Narayan. I wanted to pick up first on Justice Thomas and the way to do this is to start by figuring out what is the decision, capital D decision, and then everything that led up to that decision is pre-decisional. That would be a pretty simple formula, and obviously there would be questions in some cases about what the decision is. Here, theoretically, you could argue EPA's decision, but the government acknowledges that the services' opinions are the decision. What's wrong with that framework? I don't think anything is wrong with it, so long as we recognize that when EPA gives a proposed regulation to the services and asks does it pass muster under the FOIA framework. The second question I wanted to ask is the need for clear rules in the FOIA context. The need for that is multi-pronged. First, the agency officials who engaged in deliberations need to be able to speak with candor. Second, FOIA officers who are rampant in the executive branch and resources on FOIA could use clarity. District court judges in the District of Columbia and elsewhere would lament the lack of clarity and clear rules in FOIA cases. That raises the concern that the effects-based tests or looking at the effects of the test and could blur the long-standing principle of the deliberative process privilege. Lots of drafts have real effects within the executive branch. Can you respond to that? I'll start with the agencies. It's important here that the services have developed workable standards and they do distinguish between drafts that have decisional weight and those that are deliberative. There is no evidence that there is any lack of clarity that is impeding their activities. The district courts have not- yes, they are perhaps more than those required under other elements of the APA. It is always possible for an agency to submit declarations that don't speak to the standards and say these standards are unworkable. For an agency to put in facts like there are elements of the biological analysis that we did not agree or all of those things are in their possession and the reason FOIA places the burden on the agency is because they are the only ones that have it. In general, these cases have been resolved in typical FOIA fashion. Look at the regulations and statutes and if all of that is not clear, there is the option of in camera review. Thank you. That is helpful. Justice Barrett? I have a question following up on Justice Breyer. I want to be sure I understand the consequences that flow from each. In your conversation with Justice Breyer, you identified the biological opinion which is available by regulation and the draft of the draft. Is it true that the draft biological opinion is always FOIAble and there is no controversy about that? There is controversy about that. It is available if there is an applicant involved. It is not a purely interagency document. Those are produced. One of the controversies here is is that kind of document available or not? Thank you. My next question has to do with what you